Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7968 | **DATE** | 11/30/2001 |
| **CASE TITLE** | Steven Scotti vs. Vernette Russell, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Judgment is entered in favor of defendants Vernette Russell and Christopher Hughes and against plaintiff Steven Scotti. This case is hereby dismissed with prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | DEC 03 2001 date docketed |
| | Notified counsel by telephone. | docketing deputy initials |
| ✓ | Docketing to mail notices. | date mailed notice |
| ✓ | Mail AO 450 form. | mailing deputy initials |
| | Copy to judge/magistrate judge. | |

Document Number: 26

RO — courtroom deputy's initials

FOR DOCKETING 01 NOV 30 PM 3:46

Date/time received in central Clerk's Office



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **STEVEN SCOTTI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 00 C 7968** |
| **v.** | ) | |
| | ) | **Judge Ruben Castillo** |
| **VERNETTE RUSSELL and CHRISTOPHER HUGHES,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Steven Scotti brought this action under 42 U.S.C. § 1983 to obtain injunctive relief and monetary damages against two officials at Stateville Correctional Center ("Stateville"), claiming that the conditions of his confinement violated his Eighth Amendment right to adequate shelter. This Court conducted a bench trial on October 29, 2001, and ruled from the bench that Mr. Scotti failed to prove any facts establishing a violation of his Eighth Amendment rights.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

1. Plaintiff Steven Scotti is presently incarcerated at Stateville Correctional Center in Joliet, Illinois. Since June 1992, Mr. Scotti has resided in Unit H of Stateville, a Protective Custody Unit. (Scotti Tr. at 9.) While at Stateville, Mr. Scotti has earned an associate of arts degree from Lewis University and works as a teacher's aide earning $45 a month. (*Id.* at 31.)

2. Defendant Christopher Hughes is a correctional captain at Stateville, a position that he has held since April 1995 when he was promoted from correctional officer. Captain Hughes has worked at Stateville since 1986; however, he specifically worked in Unit H in 1998 and 1999. As captain, Mr. Hughes was the head of security in the Protective Custody Unit, which required him to oversee approximately twelve officers in order to ensure that the daily operations ran smoothly and that the inmates were protected properly. (*Id.* at 47-50.)

3. Defendant Vernette Russell is a caseworker supervisor for the Department of Corrections. Ms. Russell has been employed with the Department of Corrections since 1979 as a correctional counselor, correctional casework supervisor and correctional superintendent. She served as the unit superintendent for the Protective Custody Unit from mid-1998 to early-2000. As superintendent, Ms. Russell oversaw all of the employees in Unit H, including counselors, captains, correctional officers and medical technicians. (*Id.* at 62.)

4. Unit H is a Protective Custody Unit that houses approximately five hundred inmates. (*Id.* at 53.) The three levels of Unit H at Stateville each contain eight

galleries or hallways, with twelve or thirteen cells on each gallery. Gallery Two is one of the few areas that contains single-person cells. (*Id.* at 53.) The two cells located at the end of each gallery are known as "end-cells." (*Id.* at. 11.) Mr. Scotti has lived in Gallery Two since before 1998. (*Id.* at 53.) During the winter of 1998-1999, Mr. Scotti lived in cell 2B12, an end-cell, and during the winter of 1999-2000, Mr. Scotti lived in cells 2C9 and 2F5, neither of which are end-cells. (*Id.* at 12.)

5. Stateville's policy on moving cells is that a request for a cell move within a particular side of the building, even between units, is granted as long as there is an available cell in the desired location and the inmate has not unreasonably abused this privilege. (*Id.* at 53.) Although moving cells is freely permitted, it is not common for an inmate residing in a single-person cell to request to move into a shared cell because a single cell is typically more desirable. (*Id.* 67-71.)

6. The temperature in each cell is controlled in two ways. First, each cell contains a window leading directly to the outside. (*Id.* at 13.) Second, the temperature in Unit H is controlled by a forced-air HVAC heating system. On January 30, 1998, Dean Thompson, a registered engineer for the State of Illinois, inspected the HVAC system and found it to be in good condition, as it was capable of maintaining a 68 degrees Fahrenheit in a typical cell when the outside air temperature was 0 degrees Fahrenheit. (Defs.' Ex. 1 at 2-3.) Mr. Thompson noted that, while the HVAC system was functioning appropriately, the temperature in the cells could be compromised by other factors, such as the use of

the windows as an intercom system by inmates throughout the gallery, equipment breakdown or normal zoning temperature variances of not more than three degrees in Unit H. (*Id.* at 4.)

7. The HVAC heating system was not functioning on January 17, 2000, but was repaired by a contractor that same day. On January 18, 2000, the HVAC heating system broke again. The system, however, was functioning by 8:00 p.m. that same evening. (Pl.'s Ex. 2.)

8. Stateville maintains a temperature log to record the temperatures inside various cells throughout Stateville. The temperature taken in Unit H from January 10, 2000 to March 30, 2000 shows temperature ranges from 64.6° to 80.6° degrees Fahrenheit, with the majority of the readings ranging from 74° to 78° degrees Fahrenheit. The readings from January 17-18, 2000, when the HVAC heating system was broken, were excluded from this temperature range. (Defs.' Ex. 2.)

9. During the winters of 1998 to 2000, Stateville hired an inmate to tape industrial freezer plastic to cover the window of every cell to further insulate Stateville from the cold. The taping process began at the first frost and was continually maintained throughout the winter. (Scotti Tr. at 55.) The only cells that did not receive the plastic insulation were those in which the inmate adamantly refused it. (*Id.* at 65.) The inmate responsible for taping up the plastic was also responsible for removing debris (*i.e.* toilet paper) from the vents in the cells. This process was intended to allow for better heat circulation. (*Id.* at 55.)

10. Stateville provides a state-issued blanket to every inmate and does not restrict the

distribution of additional blankets upon request. (*Id.* at 63; Pl.'s Hibbler Dep. at 9.)

11. On several occasions, Mr. Scotti complained that the heat in his cell was inadequate. First, Mr. Scotti wrote four letters in 1997 and 1998 to Superintendent Russell and Assistant Warden Jerome Springborn requesting that he be moved to a cell that was not an end cell. (Pl.'s Ex. 9-12.) In a letter dated December 19, 1997, Mr. Scotti wrote that he had "requested a[n] extra state blanket." (Pl.'s Ex. 9.) Second, he filed three grievances in December 1999, stating that the temperature in his cell was inadequate. In these grievances, Mr. Scotti requested that adequate heat be provided in the cells and that he be given an extra blanket. (Pl.'s Ex. 3-5.) Third, on January 10, 2000, Mr. Scotti filed an emergency grievance that the temperature was "intolerable." (Pl.'s Ex. 14.) Although his grievances were denied, Mr. Scotti was moved from an end cell to a non-end cell on January 26, 2000, and efforts were made to clean the vents in his cell to allow for a better flow of heat. (Pl.'s Ex. 5-6.)

12. A review of Mr. Scotti's medical records at Stateville reveals that from June 1998 to April 2000, Mr. Scotti sought medical attention on sixteen occasions for various ailments including several visits for an acne problem, a mental health assessment and an injury to his finger. (Defs.' Ex. 5.) On July 31, 1998, Mr. Scotti sought medical assistance for flu-like symptoms, including vomiting and headaches. (*Id.*) In addition to his visits to Stateville's medical facility, Mr. Scotti was seen by a medical technician who came to his cell and gave him cold

tablets and Tylenol when Mr. Scotti complained of back problems, difficulty sleeping and headaches. (Scotti Tr. at 27.) Significantly, there is no indication that Mr. Scotti ever sought treatment for any condition related to his alleged excessively cold cell. (*Id.*)

13. A correctional counselor visited Mr. Scotti thirty-five times from January 30, 1998 to April 28, 1999. The counselor's cumulative summary contains complaints about cold food and confiscated property. There are also several comments written by the counselor during January and February of 1999 that indicate that Mr. Scotti made no requests or complaints at that time. There are no references to the temperature or conditions of Mr. Scotti's cell in the summary. (Defs.' Ex. 6.)

14. Mr. Scotti's credibility as a witness was seriously undermined when he denied ever having a state-issued wool blanket because his December 19, 1997 letter stated that he "requested a[n] extra state blanket." (Pl.'s Ex. 9.)

15. On the other hand, the Court finds that defense witnesses, Superintendent Vernette Russell and Captain Christopher Hughes, gave consistent, unimpeached and credible testimony. (Scotti Tr. at 47-72.)

## CONCLUSIONS OF LAW

1. Under the Eighth Amendment, prisoners are entitled to adequate shelter, including the "minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 833-834 (1994). A prisoner alleging unconstitutional conditions of confinement must prove that the alleged violations were sufficiently severe, and

that the named prison officials acted with deliberate indifference to the plaintiff's health or safety. *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997).

2. In order to prove that inadequate heating in a prison is sufficiently severe to constitute an Eighth Amendment violation, the Court considers several factors including: (1) the severity of the cold; (2) the duration of the extreme conditions; (3) whether the prisoner has alternative means to protect himself from the cold; (4) the adequacy of such alternatives; and (5) whether there are other uncomfortable conditions in addition to the cold. *Id.*

3. Mr. Scotti did not prove that the alleged conditions were sufficiently severe to constitute a violation of his Eighth Amendment right to adequate shelter. While this Court does not dispute that the cell felt cold to Mr. Scotti, there is no evidence to support the contention that the temperatures were intolerable or that they caused health problems. Because of the inherent subjectivity involved in deciding what is a comfortable temperature, this Court looks to objective criteria to determine whether the cold in this case was severe.

4. The engineer's survey of the heating system coupled with the temperature readings from various cells in Unit H prove that the heating system at Stateville was functioning adequately. (Defs.' Ex. 1-2.) Regrettably, there was an absence of heat for a period of approximately twenty-four hours on January 17-18, 2000. This limited time, however, was not of sustained duration to cause sufficient damages. (Pl.'s Ex. 2.)

5. Furthermore, during the two years at issue in this case, Mr. Scotti did not suffer any illness as a result of the temperature of his cell. Indeed, his only flu-like symptoms occurred in the summer, on July 31, 1998. Mr. Scotti, who had weekly visits from a correctional counselor and who frequently saw a medical practitioner for an acne problem, had many opportunities to voice any complaints resulting from the temperature in his cell, but he did not choose to do so. (Pl.'s Ex. 5-6.)

6. The Court also finds that Stateville provided at least two alternative means of protecting oneself from the cold. First, extra blankets were readily available upon request, and inmates were permitted to have several blankets. (Pl.'s Hibbler Dep. at 9.) Although Mr. Scotti testified that he was not issued a standard wool blanket, his testimony is questionable in light of a letter he wrote to the warden in which he stated that he had "requested a[n] extra state blanket," thus indicating that he already had one state-issued blanket. (Pl.'s Ex. 9.) Second, Stateville supplemented its heating system with an effort to insulate every cell by taping large sheets of industrial factor plastic in front of the cell window. In fact, Stateville assigned one of its workers the permanent duty of distributing and maintaining this additional form of insulation. (Scotti Tr. at 55.) The availability of extra blankets and extra insulation from the cold indicates that there were alternative means of warmth.

7. The Court's review of the totality of the evidence leads it to conclude that the temperature in Mr. Scotti's cells during the two winters at issue was not

sufficiently severe so as to constitute a violation of Mr. Scotti's Eighth Amendment rights.

8. Additionally, the facts of this case do not lead to a finding of liability under *Sanville v. McCaughtry*, 266 F.3d 724, 738-40 (7th Cir. 2001) (holding that, in order to be held liable under the Eighth Amendment, prison officials must be aware of the substantial risk that an inmate might take his own life and must fail to take reasonable steps to prevent such an act). In light of the medical evidence, the temperature readings and Mr. Scotti's testimony, we find that there was no substantial risk to Mr. Scotti's health and, further, that Defendants took reasonable steps to prevent any injury to Mr. Scotti.

9. Assuming, *arguendo*, that the alleged deprivation was sufficiently severe, Mr. Scotti must also show deliberate indifference on the part of Superintendent Russell and Captain Hughes. Deliberate indifference is satisfied if Defendants had actual knowledge of impending harm to Mr. Scotti and had the power to protect him from the harm. *Diggs v. Godinez*, No. 944-C-7392, 1997 Westlaw 308847, at *3 (N.D. Ill. June 3, 1997). Mr. Scotti failed to prove deliberate indifference because Defendants offered alternative means for prisoners to protect themselves from the cold. *See Del Raine v. Williford*, 32 F.3d 1024, 1036 (7th Cir. 1994).

10. The steps taken by Superintendent Russell and Captain Hughes to insulate the windows of the cells from the cold and to clean out the vents of stuffed paper indicate their honest efforts to provide adequate living conditions. In addition,

Stateville maintained the heating system and had it regularly examined. Thus, Superintendent Russell and Captain Hughes did not demonstrate the necessary deliberate indifference to prove an Eighth Amendment violation. *See id.*

## CONCLUSION

For the reasons stated in the Court's Conclusions of Law and Findings of Fact, the Clerk of the Court is directed to enter judgment for Defendants Vernette Russell and Christopher Hughes in this case. We are, however, compelled to note that efforts must continually be made to improve the heating conditions at Stateville Correctional Center. It has been over twenty years since the *Godinez* decision brought to light the questionable situation which exists at Stateville. If state officials want to avoid further litigation on this issue, they should make continued efforts to improve the heating system, window insulation and blanket distribution practices. Merely taping plastic sheets over poorly insulated windows may not avoid liability in future cold weather related cases.

**ENTERED:**

**Judge Ruben Castillo**
**United States District Court**

**Dated: November 30, 2001**